# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

JEFFREY  WARONKER,  Individually  and
on behalf of all others similarly situated,

c/o
Law Office of Martin H. Schreiber II, LLC
3600 Clipper Mill Road
Suite 201
Baltimore, MD 21211

      Plaintiff,

      v.

UNDER ARMOUR, INC.,
1020 Hull Street
3rd Floor
Baltimore, MD 21230

      Serve on:
      THE CORPORATION TRUST,
      INC.
      2405 York Road
      Suite 201
      Lutherville Timonium,
      Maryland 21093

KEVIN A. PLANK
c/o Under Armour, Inc.
1020 Hull Street
3rd Floor
Baltimore, MD 21230

      Serve on:
      THE CORPORATION TRUST,
      INC.
      2405 York Road
      Suite 201
      Lutherville Timonium,
      Maryland 21093

PATRIK FRISK,
c/o Under Armour, Inc.

Case No.:

Class Action Complaint

JURY TRIAL DEMANDED

1

1020 Hull Street
3rd Floor
Baltimore, MD 21230

    Serve on:
    THE CORPORATION TRUST,
    INC.
    2405 York Road
    Suite 201
    Lutherville Timonium,
    Maryland 21093

DAVID E. BERGMAN,
c/o Under Armour, Inc.
1020 Hull Street
3rd Floor
Baltimore, MD 21230

    Serve on:
    THE CORPORATION TRUST,
    INC.
    2405 York Road
    Suite 201
    Lutherville Timonium,
    Maryland 21093

BRAD DICKERSON
c/o Under Armour, Inc.
1020 Hull Street
3rd Floor
Baltimore, MD 21230

    Serve on:
    THE CORPORATION TRUST,
    INC.
    2405 York Road
    Suite 201
    Lutherville Timonium,
    Maryland 21093

and

LAWRENCE "CHIP" MOLLOY,
c/o Under Armour, Inc.
1020 Hull Street
3rd Floor

Baltimore, MD 21230

    Serve on:
THE CORPORATION TRUST,
INC.
2405 York Road
Suite 201
Lutherville Timonium,
Maryland 21093


    Defendants.

Plaintiff Jeffrey Waronker, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Under Armour, Inc. ("Under Armour" or the "Company"), as well as media and analyst reports about the Company and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired publicly traded Under Armour securities between September 16, 2015 and November 1, 2019, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

4.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because Under Armour maintains its headquarters in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

5.       In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

6.       Plaintiff Jeffrey Waronker purchased Under Armour securities during the Class Period, as described in the Certification attached hereto and incorporated herein by reference, and suffered damages.

7.       Defendant Under Armour is a Maryland corporation with its principal place of business located at 1020 Hull Street, Baltimore, Maryland 21230. Under Armour's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbols "UA" (Class C Stock) and "UAA" (Class A Stock).

8.       Defendant Kevin A. Plank ("Plank") is the founder of Under Armour and served as Chief Executive Officer ("CEO") and Chairman of the Board throughout the Class Period, holding these positions from the Company's formation in 1996 through present. As CEO, Plank spoke on Under Armour's behalf during conference calls, in press releases, and in the media. Plank was also the Company's largest shareholder throughout the Class Period, beneficially owning approximately 15% of all shares outstanding and controlling approximately 65% of the voting shares.

9.       Defendant Brad Dickerson ("Dickerson") served as the Company's Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") during part of the Class Period, holding these positions from 2008 and early 2015, respectively, until he resigned from both positions in early 2016. Dickerson left the Company shortly after his resignation as CFO and COO took effect,

in February 2016. As CFO and COO, Dickerson spoke on Under Armour's behalf during conference calls.

10.     Defendant Lawrence "Chip" Molloy ("Molloy") served as the Company's CFO during part of the Class Period, holding the position from January 2016 until he resigned as CFO effective February 3, 2017. Molloy left the Company in February 2017 shortly after his CFO resignation took effect. As CFO, Molloy spoke on Under Armour's behalf during conference calls.

11.     Defendant David E. Bergman ("Bergman") is the Company's CFO, and was formerly a principal accounting officer and principal financial officer during part of the Class Period. He has held the CFO position from December 2017 to present.

12.     Defendant Patrik Frisk ("Frisk") served as the Company's COO and President during the Class Period.

13.     During the Class Period, Defendants Plank, Dickerson, Molloy, Bergman, and Frisk (collectively the "Individual Defendants") oversaw the Company's operations and finances. The Individual Defendants were intimately knowledgeable about all aspects of Under Armour's financial and business operations and were also intimately involved in deciding which disclosures would be made by Under Armour. The Individual Defendants made various public statements for Under Armour during the Class Period, and participated in Class Period investor conferences.

**DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS**

14.     On August 4, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2015 (the "2Q 2015 10-Q"). The 2Q 2015 10-Q was signed by Defendant Dickerson. Attached to the 2Q 2015 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Plank and Dickerson attesting to the accuracy of the financial statements and the disclosure of all fraud.

15.     The 2Q 2015 10-Q stated, in pertinent part, the following about revenue recognition:

> Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business.

16.     The 2Q 2015 10-Q stated the following about internal controls over financial reporting:

> *Evaluation of Disclosure Controls and Procedures*
> Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
> *Changes in Internal Controls*
> There has been no change in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

17.     On October 22, 2015, the Company issued a press release entitled "Under Armour Reports Third Quarter Net Revenues Growth of 28%; Raises Full Year Outlook" which stated, in pertinent part:

> Net revenues increased 28% in the third quarter of 2015 to $1.20 billion compared with net revenues of $938 million in the prior year's period.  On a currency neutral basis, net revenues increased 31% compared with the prior year's period.

18.     The October 22, 2015 press release included Defendant Plank's highlighting "our 22nd straight quarter of at least 20% net revenue growth."

19.     On November 4, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2015 (the "3Q 2015 10-Q"). The 3Q 2015 10-Q was signed by Defendant Dickerson. Attached to the 3Q 2015 10-Q were SOX certifications signed by Defendants Plank and Dickerson attesting to the accuracy of the financial statements and the disclosure of all fraud.

20.     The 3Q 2015 10-Q stated, in pertinent part, the following about revenue recognition:

> Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business.

21.     The 3Q 2015 10-Q stated the following about internal controls over financial reporting:

> *Evaluation of Disclosure Controls and Procedures*
> Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
> *Changes in Internal Controls*
> There has been no change in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter

that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

22.     On January 28, 2016, the Company issued a press release entitled "Under Armour Reports Fourth Quarter Net Revenues Growth of 31% And Full Year Net Revenues Growth of 28%" which stated, in pertinent part:

> Net revenues increased 31% in the fourth quarter of 2015 to $1.17 billion compared with net revenues of $895 million in the prior year's period.  On a currency neutral basis, net revenues increased 33% compared with the prior year's period.

23.     The January 28, 2016 press release included Defendant Plank's highlighting the streak of consecutive quarters of 20+% net revenues growth, stating "We delivered our 25th consecutive quarter of more than 20% net revenues growth in our largest product category of apparel."

24.     On the same day, Defendants held a conference call with analysts to discuss the Company's financial results.

25.     Following Dickerson's opening remarks, an analyst questioned Defendants about a January 10, 2016 Morgan Stanley report showing the Company's slower growth, loss of market share, and ASP reductions. Dickerson stated: "our ability to improve margins in apparel is not only possible, but it's happening right now as we speak."  Plank later added that "we do see the ability to continue to drive ASPs and improve margin by – through premium products as the way that we'll build it out."

26.     On February 22, 2016, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendant Molloy. Attached to the 2015 10-K were SOX certifications signed by Defendants Plank and Molloy attesting to the accuracy of the financial statements and the disclosure of all fraud.

27.     The 2015 10-K stated, in pertinent part, the following about revenue recognition:

Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business. The level of our working capital generally reflects the seasonality and growth in our business. We generally expect inventory, accounts payable and certain accrued expenses to be higher in the second and third quarters in preparation for the fall selling season.

*       *       *

*Revenue Recognition*

        Net revenues consist of both net sales and license and other revenues. Net sales are recognized upon transfer of ownership, including passage of title to the customer and transfer of risk of loss related to those goods. Transfer of title and risk of loss are based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. In some instances, transfer of title and risk of loss take place at the point of sale, for example at our brand and factory house stores. We may also ship product directly from our supplier to the customer and recognize revenue when the product is delivered to and accepted by the customer. License revenues are primarily recognized based upon shipment of licensed products sold by our licensees. Sales taxes imposed on our revenues from product sales are presented on a net basis on the consolidated statements of income and therefore do not impact net revenues or costs of goods sold.

        We record reductions to revenue for estimated customer returns, allowances, markdowns and discounts. We base our estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which is inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are recorded as an offset to accounts receivable as settlements are made through offsets to outstanding customer invoices. As of December 31, 2015 and 2014, there were $94.5 million and $68.9 million, respectively, in reserves for customer returns, allowances, markdowns and discounts.

28.     The 2015 10-K stated the following about internal controls over financial reporting:

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of December 31, 2015 pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 (the "Exchange Act"). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2015, our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Refer to Item 8 of this report for the "Report of Management on Internal Control over Financial Reporting."

There has been no change in our internal control over financial reporting during the most recent fiscal quarter that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

29.     On April 21, 2016, the Company issued a press release entitled "Under Armour Reports First Quarter Net Revenues Growth of 30%; Raises Full Year Net Revenues Outlook to $5.0 Billion" which stated, in pertinent part:

Net revenues increased 30% in the first quarter of 2016 to $1.05 billion compared with net revenues of $805 million in the prior year's period.  On a currency neutral basis, net revenues increased 32% compared with the prior year's period.

30.     The April 21, 2016 press release included Defendant Plank specifically noting "for the past 24 consecutive quarters or six years, we have driven net revenue growth above 20%."

31.     On the same day, the Company conducted a conference call to discuss its 1Q16 financial results. During the question-and-answer session, Plank emphasized that "[a]nd again, we are to be clear, driving massive growth, and we are taking share."

32.     In response to an analyst question later in the call, Molloy stated that the majority of inventory increases were planned and expected to "creep away" during 2016.

33.     On April 29, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2016 (the "1Q 2016 10-Q"). The 1Q 2016 10-Q was signed

by Defendant Molloy. Attached to the 1Q 2016 10-Q were SOX certifications signed by Defendants Plank and Molloy attesting to the accuracy of the financial statements and the disclosure of all fraud.

34.     The 1Q 2016 10-Q stated, in pertinent part, the following about revenue recognition:

> Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business.

35.     The 1Q 2016 10-Q stated the following about internal controls over financial reporting:

> *Evaluation of Disclosure Controls and Procedures*
> Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
> *Changes in Internal Controls*
> There has been no change in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

36.     On July 26, 2016, just three months after raising guidance, the Company issued a press release entitled "Under Armour Reports Second Quarter Net Revenues Growth of 28%; Reiterates Full Year Net Revenues Outlook of $4.925 Billion" which stated, in pertinent part:

Net revenues increased 28% in the second quarter of 2016 to $1.0 billion compared with net revenues of $784 million in the prior year's period.

37.     On the same day, Under Armour hosted a conference call to discuss its 2Q16 financial results. In his opening remarks, Molloy stated that the Company expected its gross margin percentage to decline slightly for both 3Q16 and FY16.

38.     On August 3, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2016 (the "2Q 2016 10-Q"). The 2Q 2016 10-Q was signed by Defendant Molloy. Attached to the 2Q 2016 10-Q were SOX certifications signed by Defendants Plank and Molloy attesting to the accuracy of the financial statements and the disclosure of all fraud.

39.     The 2Q 2016 10-Q stated, in pertinent part, the following about revenue recognition:

> Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business.

40.     The 2Q 2016 10-Q stated the following about internal controls over financial reporting:

> *Evaluation of Disclosure Controls and Procedures*
> Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and

Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Controls*

There has been no change in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

41.     On September 7, 2016, Molloy represented the Company at the Goldman Sachs Global Retailing Conference. Molloy assured analysts that the Company's inventory positions were strong and the Company's promotions were constrained. When asked how Molloy would "characterize inventory levels at retail levels, not just for you guys but sort of across the category right now," Molloy responded that inventory was now "really healthy" and improved, and that despite excess inventory earlier in the year, the Company had not participated "too much" in promotions.

42.     On October 25, 2016, the Company issued a press release entitled "Under Armour Reports Third Quarter Net Revenues Growth of 22%; Reiterates Full Year Net Revenues Outlook of $4.925 Billion" which stated, in pertinent part:

> Net revenues increased 22% in the third quarter of 2016 to $1.47 billion compared with net revenues of $1.20 billion in the prior year's period. On a currency neutral basis, net revenues increased 23% compared with the prior year's period.

43.     The October 25, 2016 press release also included Defendant Plank specifically noting Under Armour's ongoing focus on its 20-plus quarter streak of "at least 20% net revenue growth."

44.     On November 2, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2016 (the "3Q 2016 10-Q"). The 3Q 2016 10-Q was signed by Defendant Molloy. Attached to the 3Q 2016 10-Q were SOX certifications signed by

Defendants Plank and Molloy attesting to the accuracy of the financial statements and the disclosure of all fraud.

45. The 3Q 2016 10-Q stated, in pertinent part, the following about revenue recognition:

> Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business.

46. The 3Q 2016 10-Q stated the following about internal controls over financial reporting:

> *Evaluation of Disclosure Controls and Procedures*
> Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
> *Changes in Internal Controls*
> There has been no change in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

47. The statements contained in ¶¶14-46 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or

failed to disclose that: 1) Under Armour shifted sales from quarter to quarter to appear healthier, including to keep pace with their long-running streak of year-over-year 20% net revenue growth; and 2) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

48.     On January 31, 2017, the Company issued a press release entitled "Under Armour Reports Fourth Quarter And Full Year Results; Announces Outlook for 2017" which announced dramatically lower-than-expected growth and other financial problems during 4Q16 and FY16. In the press release, Plank attributed the declines to "numerous challenges and disruptions in North American retail [that] tempered our fourth quarter results." Specifically, the Company revealed that:

(a)     Net revenues grew only 12% (to $1.3 billion) in 4Q16 (the Company's crucial holiday season), breaking a streak of 26 consecutive quarters with greater than 20% revenue growth. Net revenues in FY16 were $4.8 billion, lower than the Company's guidance of $4.925 billion issued just a few months prior, on October 25, 2016.

(b)     Operating income dropped 6% to $167 million in 4Q16 and increased only 3% to $420 million in FY16 (lower than the projected range of $440 to $445 million, an increase of 8-9%, for FY16).

(c)     FY16 gross margin dropped from 48.1% to 46.5%.

(d)     4Q16 EPS were $0.23, lower than analysts' consensus estimate of $0.25.

(e)     FY16 inventory increased 17%.

49.     Moreover, the press release provided a negative outlook for 2017. Net revenues were expected to grow only 11-12%, down sharply from the more than 20% revenue achieved by the Company for 26 consecutive quarters. In addition, gross margin was "expected to be slightly

down compared to the prior year," and operating margin was expected to fall to approximately $320 million.

50.     Coupled with the negative financial results and outlook, the Company announced that Molloy had decided to leave the Company "due to personal reasons." Molloy's sudden departure was highly suspicious because he was only at Under Armour for 13 months. In addition, Molloy was the fourth high-level senior executive to depart within that time frame, following Dickerson (whom Molloy replaced as CFO), Stafford (CMO), and Thurston (CDO). Plank was replaced by Bergman, the Company's SVP of Corporate Finance.

51.     During a conference call with analysts on the same day, January 31, 2017, Defendants elaborated on the news revealed in the Company's earnings release. In his opening remarks, Plank provided reasons for the poor results, including 2016 bankruptcies, channel dislocation, destocking, slower customer traffic, and poor product assortment, resulting in "significant promotional activities," lower pricing, and a "discounted environment."

52.     On February 23, 2017, the Company filed its annual report on Form 10-K with the SEC for the year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Plank and Bergman. Attached to the 2016 10-K were SOX certifications signed by Defendants Plank and Bergman attesting to the accuracy of the financial statements and the disclosure of all fraud.

53.     The 2016 10-K stated, in pertinent part, the following about revenue recognition:

Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business. The level of our working capital generally reflects the seasonality and growth in our business. We

generally expect inventory, accounts payable and certain accrued expenses to be higher in the second and third quarters in preparation for the fall selling season.

*        *        *

*Revenue Recognition*

Net revenues consist of both net sales and license and other revenues. Net sales are recognized upon transfer of ownership, including passage of title to the customer and transfer of risk of loss related to those goods. Transfer of title and risk of loss are based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. In some instances, transfer of title and risk of loss take place at the point of sale, for example at our brand and factory house stores. We may also ship product directly from our supplier to the customer and recognize revenue when the product is delivered to and accepted by the customer. License revenues are primarily recognized based upon shipment of licensed products sold by our licensees. Sales taxes imposed on our revenues from product sales are presented on a net basis on the consolidated statements of income and therefore do not impact net revenues or costs of goods sold.

We record reductions to revenue for estimated customer returns, allowances, markdowns and discounts. We base our estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which is inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are recorded as an offset to accounts receivable as settlements are made through offsets to outstanding customer invoices. As of December 31, 2016 and 2015, there were $146.2 million and $94.5 million, respectively, in reserves for customer returns, allowances, markdowns and discounts.

54.     The 2016 10-K stated the following about internal controls over financial reporting:

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of December 31, 2016 pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 (the "Exchange Act"). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2016, our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner

and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Refer to Item 8 of this report for the "Report of Management on Internal Control over Financial Reporting."

There has been no change in our internal control over financial reporting during the most recent fiscal quarter that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

55.     On February 28, 2018, the Company filed its annual report on Form 10-K with the SEC for the year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Plank and Bergman. Attached to the 2017 10-K were SOX certifications signed by Defendants Plank and Bergman attesting to the accuracy of the financial statements and the disclosure of all fraud.

56.     The 2017 10-K stated, in pertinent part, the following about revenue recognition:

Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business. The level of our working capital generally reflects the seasonality and growth in our business. We generally expect inventory, accounts payable and certain accrued expenses to be higher in the second and third quarters in preparation for the fall selling season.

*       *       *

*Revenue Recognition*

Net revenues consist of both net sales and license and other revenues. Net sales are recognized upon transfer of ownership, including passage of title to the customer and transfer of risk of loss related to those goods. Transfer of title and risk of loss are based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. In some instances, transfer of title and risk of loss take place at the point of sale, for example at our brand and factory house stores. We may also ship product directly from our supplier to the customer and recognize revenue when the product is delivered to and accepted by the customer. License revenues are primarily recognized based upon shipment of licensed products sold by our licensees. Sales taxes imposed on our revenues from product sales are

presented on a net basis on the consolidated statements of income and therefore do not impact net revenues or costs of goods sold.

We record reductions to revenue for estimated customer returns, allowances, markdowns and discounts. We base our estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which is inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are recorded as an offset to accounts receivable as settlements are made through offsets to outstanding customer invoices. As of December 31, 2017 and 2016, there were $246.6 million and $146.2 million, respectively, in reserves for customer returns, allowances, markdowns and discounts.

57.    The 2017 10-K stated the following about internal controls over financial

reporting:

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

There have been no change in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter that have materially affected, or that are reasonably likely to materially affect our internal control over financial reporting.

58.    On February 25, 2019, the Company filed its annual report on Form 10-K with the

SEC for the year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by

Defendants Plank and Bergman. Attached to the 2018 10-K were SOX certifications signed by

Defendants Plank and Bergman attesting to the accuracy of the financial statements and the disclosure of all fraud.

      59.    The 2018 10-K stated, in pertinent part, the following about revenue recognition:

Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business. The level of our working capital generally reflects the seasonality and growth in our business. We generally expect inventory, accounts payable and certain accrued expenses to be higher in the second and third quarters in preparation for the fall selling season.

*     *     *

*Revenue Recognition*

      We recognize revenue pursuant to Accounting Standards Codification 606 ("ASC 606"). Net revenues consist of both net sales and license and other revenues. Net sales are recognized upon transfer of ownership, including passage of title to the customer and transfer of risk of loss related to those goods. Transfer of title and risk of loss are based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. In some instances, transfer of title and risk of loss take place at the point of sale, for example at our brand and factory house stores. We may also ship product directly from our supplier to the customer and recognize revenue when the product is delivered to and accepted by the customer. License revenues are primarily recognized based upon shipment of licensed products sold by our licensees. Sales taxes imposed on our revenues from product sales are presented on a net basis on the consolidated statements of income and therefore do not impact net revenues or costs of goods sold.

      We record reductions to revenue for estimated customer returns, allowances, markdowns and discounts. We base our estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which is inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are included within customer refund liability and the value of inventory associated with reserves for sales returns are included within prepaid expenses and other current assets on the consolidated balance sheet. As of December 31, 2018 there were $301.4 million in reserves for

returns, allowances, markdowns and discounts within customer refund liability and $113.9 million as the estimated value of inventory associated with the reserves for sales returns within prepaid expenses and other current assets on the consolidated balance sheet. As of December 31, 2018, there were $246.6 million in reserves for customer returns, allowances, markdowns and discounts within accounts receivable, net.

60.     The 2018 10-K stated the following about internal controls over financial

reporting:

> Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. The Company's internal control over financial reporting as of December 31, 2018 has been audited by PricewaterhouseCoopers LLP, as stated in their report which appears herein.
>
> *Changes in Internal Controls*
> There have been no change in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter that have materially affected, or that are reasonably likely to materially affect our internal control over financial reporting.

61.     The statements contained in ¶¶ 48-60 were materially false and/or misleading

because they misrepresented and failed to disclose the following adverse facts pertaining to the

Company's business, operations and prospects, which were known to Defendants or recklessly

disregarded by them. Specifically, Defendants made false and/or misleading statements and/or

failed to disclose that: 1) Under Armour shifted sales from quarter to quarter to appear healthier,

including to keep pace with their long-running streak of year-over-year 20% net revenue growth;

2) the Company had been under investigation by and cooperating with the U.S. Department of

Justice and U.S. Securities and Exchange Commission since at least July 2017; and 3) as a result, Defendants' statements about Under Armour's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### THE TRUTH IS REVEALED

62.     On November 3, 2019, the Wall Street Journal reported on the U.S. Department of Justice and Securities and Exchange Commission investigations into Under Armour's accounting practices and related disclosures. The article, entitled "Under Armour Is Subject of Federal Accounting Probes," noted that the investigations are concerning whether Under Armour shifted sales from quarter to quarter to appear healthier. Justice Department prosecutors were conducting a criminal inquiry into the matter in coordination with civil investigators at the SEC.

63.     The Wall Street Journal updated its article the next morning with a response from the Company, confirming that it had been cooperating with the U.S. Department of Justice and Securities and Exchange Commission since July 2017.

64.      On this news, Class C shares of Under Armour (UA) fell $3.47 per share or 18.35% to close at $15.44 per share and Class A shares of Under Armour (UAA) fell $4.00 per share or 18.92% to close at $17.14 per share on November 4, 2019, damaging investors.

65.     On November 4, 2019, Under Armour conducted a conference call to discuss the Company's 3Q 2019 financial results.  In his prepared remarks, Defendant Bergman made the following statement:

> ***For many years, quarterly shifts in wholesale revenue*** related to timing of shipments based on financial goals; customer requests; year-to-year seasonal variance; different fiscal calendar alignments; product availability; logistics; and numerous other dynamics ***have been, and continue to be, part of the normal course of business practices*** in the apparel, footwear and retail sector. In this respect, ***our process for recognizing revenue and recording returns and other allowances has not changed.***

66.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, on behalf of all persons or entities that purchased or acquired publicly traded securities of Under Armour during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

68.     Members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Under Armour securities were actively traded on the NYSE. While the exact number of members of the Class can only be determined by appropriate discovery, Plaintiff believes that members of the Class number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

69.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the members of the Class sustained damages arising out of the Defendants' wrongful conduct complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel experienced and competent in class actions and securities litigation.

Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

72.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that the Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a) whether the Defendants violated the federal securities laws as alleged herein;

(b) whether the Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c) whether the Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether the Defendants participated in and pursued the fraudulent scheme or course of business complained of herein in violation of the Exchange Act;

(e) whether the Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts in violation of the Exchange Act;

(f) whether the market prices of the Company's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of the Company's securities when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

**PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

73.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     Under Armour securities were and are traded in an efficient market;

(d)     the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NYSE and was covered by multiple analysts;

(f)     as a regulated issuer, Under Armour filed periodic public reports with the SEC and the NYSE;

(g)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(h)     Under Armour regularly communicated with public investors and securities professionals via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through

other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, and

(i)    Plaintiff and members of the Class purchased, acquired, and/or sold Under Armour securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

74.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

75.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information.

## LOSS CAUSATION

76.    The market for Under Armour securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false and misleading statements and failures to disclose, Under Armour stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Under Armour stock relying upon the integrity of the market of Under Armour and market information related to the Company, and have been damaged thereby.

77.    The material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants materially misled the investing public, thereby inflating the price of Under Armour

stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make their own statements not false and misleading.

78.     The materially false and/or misleading statements made by Defendants during the Class Period resulted in Plaintiff and other members of the Class purchasing and/or owning the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

79.     As a result of their purchases of Under Armour securities during the Class Period at artificially inflated prices, Plaintiff, and the other Class members suffered damages, under the federal securities laws.

80.     The timing and magnitude of the price decline in Under Armour stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

<u>**COUNT ONE**</u>

**Against All Defendants for Violation of**
<u>**Section 10(b) of the Exchange Act and Rule 10(b)-5**</u>

81.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

82.     Plaintiff asserts this Count pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against Defendants, for the time Defendant Plank was CEO of the Company.

83.     During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

28

84.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Under Armour securities during the Class Period.

85.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for, and/or held, Under Armour securities at artificially inflated prices. Plaintiff and the Class would not have purchased or maintained shares of Under Armour at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT TWO

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

86.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

87.    Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

88.    The Individual Defendants, by virtue of their respective leadership positions in Under Armour, had the power and authority to cause Under Armour to engage in the wrongful conduct complained of herein.

89.    The Individual Defendants possessed the power and authority to control the contents of Under Armour's SEC filings and press releases.

90.    The Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

91.    By reason of their control of Under Armour, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations of Section 10(b) and Rule 10b-5 committed by Under Armour.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)    Awarding Plaintiff and the members of the Class damages, including interest;

(c)    Awarding Plaintiff reasonable costs and attorneys' fees; and

(d)    Awarding Plaintiff such equitable/injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury.

Dated: December 17, 2019

Respectfully submitted,

By: */s/ Martin Schreiber*
Martin H. Schreiber II (Bar No. 22886 )
**LAW OFFICE OF MARTIN H. SCHREIBER II, LLC**
3600 Clipper Mill Road
Suite 201
Baltimore, MD 21211
Telephone:  (410) 366-4777
Facsimile: (443) 303-5688
mhs@schreiber-law.com

*Local Counsel for Plaintiff*

Corey D. Holzer*
Marshall P. Dees*
**HOLZER & HOLZER, LLC**
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com
mdees@holzerlaw.com
lkennedy@holzerlaw.com

*Counsel for Plaintiff*

*Pending admission *pro hac vice*